## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DOROTHY DUPREE,

       Plaintiff,

v.                                        No. CIV 03-557 MCA/LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

     Plaintiff Dorothy Dupree ("Dupree") invokes this Court's jurisdiction under 42 U.S.C.

§ 405(g), seeking judicial review of a final decision of the Commissioner of Social Security

("Commissioner").   The Commissioner determined that Dupree was not eligible for disability

insurance benefits ("DIB") or Supplemental Security Income ("SSI"). On  May 12, 2003, Dupree

filed a form civil rights complaint against the Social Security Administration, under 42 U.S.C. § 1983,

but the relief she seeks all pertains to the denial of her applications for DIB or SSI benefits.  [Doc.

No. 1.]   Thus, the Court characterizes her § 1983 complaint as a request to reverse the

Commissioner's decision and for remand.

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

Dupree was born on March 18, 1945 and was 56 years old at the time of the February 6, 2002 administrative hearing. She dropped out of high school in about the ninth grade but later attained her G.E.D. [Tr. at 54.] She was employed with Albuquerque Public Schools ("APS") from about 1982 to March 1996. [Tr. at 55.] From 1990 through 1996, she worked as a health assistant at APS, and performed some data entry and retrieval of student schedules. [Tr. at 55.] Her job duties also included administration of first aid to students and staff, dispensation of medications and purchase of supplies. [Tr. at 238.] In early 1995, she allegedly began having difficulties with pain in her right wrist. In 1996, she contends that APS terminated her for unauthorized absences related to her medical condition. [Tr. at 56.]

In 1996, Dupree filed her application for social security benefits. [Tr. at 200, 1147.] Over the last eight years, Dupree had several administrative hearings concerning her request for benefits, with the matter being remanded once for further development of the record. [Tr. at 170.] The administrative record now exceeds 1100 pages, and Dupree continues to submit medical records and hand-written statements,[2] all of which the Court has examined in reaching its decision here.

Dupree's April 26, 1996 application for benefits alleges an onset date of February 28, 1996. [Tr. at 200, 1147], due to a disabling condition, presumably carpal tunnel syndrome of her right wrist. [Tr. at 200, 250.] By May 19, 1997, Dupree complained of pain in both hands, as well as in her back, legs, and feet. [Tr. at 250.] Since 1997, her physical complaints have multiplied. [*See* discussion *infra.*]

---

[2]The Court notes that Dupree has regularly submitted lengthy hand-written letters and materials to the Court and to the administrative agencies during her pursuit of benefits, notwithstanding her right-handedness and claim of significant pain in her right hand and wrist.

On September 3, 1998, ALJ Gary L. Vanderhoof held the first administrative hearing, during which Dupree represented herself.  On April 6, 1999, the ALJ denied Dupree's application for disability benefits.  [Tr. at 116.]  Judge Vanderhoof determined that Dupree could perform light work and return to her previous job as a health assistant.  Thus, she was not disabled.  [Tr. at 126.]  On March 6, 2001, the Appeals Council vacated Judge Vanderhoof's decision and remanded the matter so that the ALJ could further develop the record as to Dupree's alleged heart condition and to obtain evidence from a vocational expert, if warranted by the expanded record.  [Tr. at 171-72.]

ALJ Vanderhoof handled the remand and began a hearing on September 27, 2001.  [Tr. at 75.]  However, Dupree brought a number of records to the September 27 hearing, which the ALJ did not have time to assess before proceeding.  Thus, he continued that hearing without accepting any testimony.  [Tr. at 84.]

On February 6, 2002, Judge Vanderhoof conducted the continued hearing, at which Dupree was represented.  [Tr. at 88.]  A vocational expert testified.  The ALJ left the proceeding open until additional medical records were submitted.  [Tr. at 110.]  In a decision issued April 16, 2002, Judge Vanderhoof again determined that Dupree did not satisfy the requirements to be awarded benefits under the Social Security Act.  [Tr. at 24.]  Dupree requested review, but the Appeal Council upheld the ALJ's determination.  [Tr. at 14.]  Dupree then filed this federal lawsuit or appeal.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the

---

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[6] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[8]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[9] age, education and past work experience, she is capable of performing other work.[10]  If the Commissioner proves other work exists which the

_____

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. § 404.1520(b) (1999).

[6]20 C.F.R. § 404.1520(c) (1999).

[7]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[8]20 C.F.R. § 404.1520(e) (1999).

[9]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[10]20 C.F.R. § 404.1520(f) (1999).

claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[11]

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997). Here, Judge Vanderhoof relied on a vocational expert's testimony in reaching his decision.

**Standard of Review and Allegations of Error**

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he

---

[11]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

> chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).   If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.   The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner.   Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

Here, in accordance with the remand Order, the record was expanded as to Dupree's alleged heart condition, the ALJ reviewed other available updated records, a vocational expert testified at the hearing, and Judge Vanderhoof issued a new decision.  [Tr. at 21-33, 77, 88, 172.]  The ALJ also attempted to set up several consultative examinations for Dupree but she interfered with those efforts and never did attend a consultative examination.  [Tr. at 26, 27, 184, 189, 346, 366, 367, 368, 1097, 1099, 1100.]  After reviewing Dupree's updated medical records and reports regarding a possible cardiac problem, along with all other problems, and after considering all testimony at the new hearing, including the VE's testimony, Judge Vanderhoof rejected Dupree's claim for benefits, concluding that she retained the residual functional capacity to do light work not involving detailed instructions and not requiring repeated use of her hands above the shoulder level, and that she was able to return to her past relevant work as a health assistant.  [Tr.  32-33.]

In reaching this decision, the ALJ made the following findings:  (1) Dupree had not engaged in substantial gainful activity during the pertinent period (2) Dupree's alleged impairments of carpal tunnel syndrome ("CTS"), thoracic outlet syndrome ("TOS"), chronic back, neck and bilateral arm

and leg pain, and chronic anxiety and depression[12] associated with her medical conditions, were not of such severity as to meet or medically equal one of the listed impairments; (3) Dupree's allegations regarding her symptoms and functional limitations were not supported by the evidence and lacked credibility; (4) Dupree retained a residual functional capacity that supported exertionally light work activities, with no detailed instructions and without requiring her to repeatedly use her hands above the shoulder level; and (5) vocational expert testimony established that she was able to perform her past relevant work as a health assistant.  [Tr. at 24-33.]  Judge Vanderhoof's findings directed a conclusion that Dupree was not disabled during the time period at issue.  [Tr. at 33.]

In her complaint, which was submitted *pro se*,[13] Dupree argues essentially that the ALJ's RFC determination was erroneous and that he failed to consider the State of New Mexico's certificate that Dupree was 100% disabled due to TOS, CTS, osteoporosis, and back, leg and hip pain.  [Tr. at 288, 629.]

## Summary of Dupree's Employment and Medical History

The Court carefully examined Dupree's voluminous medical records and submissions, including the entire 1158-page underlying administrative record, and all pleadings and documents supplied by Dupree in this proceeding.  For purposes of this opinion, the Court provides summaries and highlights of some of the records and submissions.

---

[12]As appropriately noted by the ALJ, Dupree never alleged that she had a significant mental impairment. Indeed, she typically refused any type of psychological consultation or anti-depressant medication when her health care providers suggested such care.  [*See, e.g.,* tr. at 372, 375, 469, 474, 891.]  Thus, even though some of Dupree's doctors suggested that she might need or consider such care, there was little objective evidence available for review by the ALJ as to any type of mental health impairment.  [Tr. at 25.]

[13]Dupree had counsel and/or representation during various aspects of the underlying proceedings. However, it appears that she dismissed a number of attorneys.  [Tr. at 89, 134, 139, 150, 173.]  Dupree represents herself in this federal court proceeding.

Dupree married at age 15 and remained married for about 25 years, until 1985.  She obtained her G.E.D. and took some community college courses in computers and typing.  She raised four children, all of whom are grown.  APS employed Dupree as a cafeteria worker, educational assistant and health assistant over an 18 year period.  From about 1990 through early 1996, she worked at APS as health assistant.

In February 1996, it appears that Dupree's APS employment ended.  She contends she was terminated for absences related to her health problems and appointments.  An APS letter to Dupree, dated February 28, 1996, indicates she had had multiple absences from work and had exhausted her sick leave.  In an effort to assist her, APS assigned her to the classroom as a special education assistant, but again she was not showing up for work.  APS then required a doctor's excuse for any and all absences from work and warned Dupree that failure to supply the documentation could result in a recommendation that she not be re-hired for the next contract period.  [Tr. at 309.]  It appears that Dupree requested some doctor's notes excusing her from work, and that she provided a few return to work certifications with restrictions. [Tr. at 388, 467, 490, 578.]  Nothing in the record indicates that Dupree was terminated from her job, or that she ever attempted to return to work after February 1996.

### Medical Records: 1985-1994

Dupree supplies a number of medical records for these years, none of which indicate any physical problems similar to those she claims disabled her.  In 1986, she attempted to obtain her medical records to see if she could get more alimony from her ex-husband.  [Tr. at 1073.]  In early 1994, she complained of swelling of the fingers and feet, but there were no complaints in these early records of CTS or problems with her wrists.  [Tr. at 519.]

**Medical Records:  1995**

In 1995, and for the next seven years, Dupree made repeated visits and calls to many different physicians and specialists.  A number of doctors refused to see Dupree after initially seeing her for a period of time, because they believed they had nothing further to offer her medically, or because they found her threatening, uncooperative, unreasonably demanding, unwilling to rely on their medical expertise and recommendations, and/or simply rude.  [Tr. at 184, 355, 367, 372, 382, 439, 446, 448, 529, 536, 675, 706, 724, 727, 746, 747, 749, 843, 891, 905, 949.]  At least one physician refused to see Dupree because she felt that Dupree was asking her to perjure herself.  [Tr. at 891.]  Many doctors spent hours counseling and reassuring Dupree and/or reviewing her voluminous and lengthy prior medical record.  [Tr. at 660, 770, 800, 812, 847, 872-76.]  She had innumerable medical tests over the years, many of which (if not most) were "entirely normal".  [*See, e.g.,* Tr. at 369, 375, 395, 444, 483, 530, 609, 616-17, 637, 871, 964, 979.]

Although there are a number of conflicting dates as to when Dupree first began having trouble with her wrists, the medical records indicate reports of hand problems in early 1995.  [Tr. at 371.]  Electrical studies conducted then were significantly within normal ranges.  [Tr. at 369, 371, 375.]  She believed her hand looked swollen but several doctors could not see swelling.  [Tr. at 371, 635.]  X-rays of her hand were normal.  [Tr. at 637.]  Dr. Jones of Presbyterian noted that even if it were concluded that she had CTS, there was a problem with causation.  It did not sound to him as if anything at her work could have caused CTS.  [Tr. at 639.]  No objective neurologic deficits were found in either hand.  [Tr. at 671.]  There was no evidence of median nerve compression in the carpal tunnel.  [Tr. at 483.]

Even though Dr. Laurel McGinty, a Lovelace hand surgeon, ultimately found she had nothing to offer Dupree medically, she did place her on some work restrictions upon Dupree's request for a work release note.  [Tr. at 490.]  Dupree was not to do repetitive activities of the hand, but could answer telephones and do light office work.  She was not to engage in extended long-hand writing.  [Tr. at 670.]  In July 1995, Dr. McGinty explained to Dupree that she should return to work and see how she did.  She also discussed with Dupree whether Workers' Compensation would cover a carpal tunnel release procedure under circumstances like these.  Dr. McGinty described Dupree's response as almost hysterical.  Dr. McGinty wanted Dupree to have a psychological consultation and did not believe that treating the possible CTS would resolve her problems.  [Tr. at 375-77.]

Throughout the 1995 medical records, there is evidence of possible psychological issues for Dupree.  She was described as having an emotional outburst in physical therapy.  [Tr. at 639.]  Symptoms of panic attacks and anxiety were noted.  [Tr. at 495.]  She cried out during nerve conduction tests and could not complete testing.  [Tr. at 380.]  She complained bitterly of pain, but doctors could not pinpoint any particular site of tenderness.  She refused to take medications that were offered to her.  [Tr. at 372, 382.]  She believed that symptoms like dryness of her eyes were indicative of some systemic disease.  [Tr. at 542.]  Notwithstanding possible emotional issues and doctors' recommendations throughout the years that she seek some kind of psychological assistance, Dupree consistently refused these recommendations.

**Medical Records: 1996**

In January 1996, Dupree returned to see Dr. Vivian Giudice, her long-term primary care doctor.  Dr. Giudice removed Dupree's hand splints but observed no swelling, warmth or erythema, even though Dupree thought she had these problems.  The medical note indicates "evaluate further

-10-

the emotional overlay regarding the job."  [Tr. at 474.]  On January 19, 1996, Dupree was upset

about why she was to see Dr. Klein, a psychologist.  She was concerned that it would affect her

workers' compensation claim.  She did not feel she needed to see a psychologist.  [Tr. at 469.]

In February 1996, she saw Dr. Vichick, a hand specialist.  She told him that she had CTS and

that Dr. McGinty confirmed probable CTS.  [Tr. at 578.]  It appears from the records that Dupree

frequently attributed more definite statements to her doctors than the medical notes reflect they made.

Dr. McGinty did not reach a definite or even probable diagnosis of CTS, although she did prescribe

splints for her.  Dr. Vichick concluded, after a detailed medical record review, that she had probable

bilateral CTS, "very mild."  He believed that her status was clouded by her view that she had a

significant illness.  [Tr. at 578.]  On February 15, he tried to explain the very mild bilateral CTS

diagnosis to her, but she was reluctant to accept his explanations.  She denied that poor posture and

a general lack of conditioning might impact her symptoms.  He recommended physical therapy.  [Tr.

at 577.]

On February 29, 1996, Dr. Moheb Moneim, Chief of Hand Surgery at University Hospital saw

Dupree and despite three prior negative nerve tests, he decided that she had probable CTS on the

right side.  The record shows that she wanted surgery even though he told her that the prior negative

nerve testing made surgery results more unpredictable. [Tr. at 409.]  On March 21, 1996, Dr.

Moneim performed a release procedure on her right wrist.  [Tr. at 410.]  By April 3, 1996, Dupree

called Dr. Giudice's office requesting that she sign a certificate of disability.  [Tr. at 458.]  On April

9, Dupree filed her application for social security benefits.  [Tr. at 200.]

Dupree initially felt better after the release procedure, but began having complaints by the Fall

1996.  Nerve studies were repeated and were normal.  [Tr. at 395.]  In September 1996, she had

-11-

normal range of motion in her fingers.  Repeat surgery did not seem like an option, and she appeared to understand she would have to live with some discomfort.  [Tr. at 395.]

On December 17, 1996, Kathryn Spiering of the Department of Vocational Rehabilitation ("DVR") conducted a psychological evaluation of Dupree.  She was cooperative during this testing which indicated an average IQ.  The psychologist noted she had little insight into her feelings and strong dependence needs.  [Tr. at 421.]  Ms. Spiering wondered why APS really let her go.  She diagnosed Dupree with a communication disorder involving learning.  [Id.]

Also in December 1996, Dupree returned to see Dr. Moneim requesting that he fill out a permanent impairment evaluation.  [Tr. at 391.]  He examined her and found a full range of motion in both shoulders and elbows.  Dr. Moneim asked her to have her attorney contact his office and then he planned to get her the rating.  [Tr. at 391.]

**Medical Records:  1997**

On March 31, 1997, a Psychiatric Review Technique form was completed for Dupree.  She was rated as having only slight degrees of limitation, with no episodes of deterioration noted.  [Tr. at 429-436.]  On April 4, 1997, the SSA concluded that her condition was not severe enough to be considered disabling.  [Tr. at 135.]

In May 1997, she was seeing physicians at First Choice and told one doctor that she wanted SSI or some support to go to school.  She denied feeling depressed.  [Tr. at 446.]  At this point, it seemed that Dr. Moneim had refused to see her again.  [Tr. at 446, 448.]  However, on May 19, 1997, Dr. Moneim did see her, noting that they had exhausted all attempts to figure out what the etiology of her symptoms was.  He noted that he had given her a 1% rating of impairment of her right upper extremity.  [Tr. at 536.]

-12-

In October 1997, the First Choice provider observed that her complaints seemed minor to him.  [Tr. at 439.]  Nonetheless, more tests were ordered.  On December 9, 1997, nerve testing was once again normal.  No abnormalities were shown by the EMG and there was no sign of "thoracic outlet syndrome."  [Tr. at 533.]

On December 15, 1997, there is a letter from Dr. George Swajian, D.O. to Dupree's attorney. Dr. Swajian was with Orthopedic and Hand Surgery at Heights General Medical Center, and provided yet another evaluation.  [Tr. at 526-28.]  His history[14] indicates that her complaints started in 1994 after Dupree was using a computer at her job.  [Tr. at 526.]  (Medical records show a 1995 date and some records indicate that she believed her problems started from having to repetitively turn a key in a lock at work).  Dr. Swajian seems to be the first physician to state that Dupree "appears to have a thoracic outlet problem."  However, he noted the situation needed to be evaluated in more detail and more testing was necessary.  He felt that an MRI would be of limited value but suggested X-rays of the cervical spine.  [Tr. at 528.]  The December 30, 1997 X-rays indicate that the cervical spine was normal, the lumbar spine was normal, and the thoracic spine was normal.  [Tr. at 530-32.]

**Medical Records:  1998**

In early 1998, the medical records show that Dr. Moneim did not want to see Dupree again. [Tr. at 529.]  Dr. Swajian wrote a note for Dupree in March 1998, stating that she was undergoing physical therapy and was unable to work at this time.  [Tr. at 607.]  On April 5, 1998, Dr. George Chandran of Duke City Vascular Lab wrote a report to Dr. Swajian.  Dr. Chandran evaluated Dupree at Dr. Swajian's recommendation.  [Tr. at 588.]  Dr. Chandran noted that the Doppler evaluation showed "some compromization of flow beyond 90 degrees" but that the photophlethysmography still

---

[14]Parts of this record are illegible because someone has placed black lines through some sentences.

shows excellent flow retained to the finger tips indicating nothing [illegible] going on in the thoracic outlet." [Tr. at 588.]  Dr. Chandran suggested for the sake of completion that she see a neurologist for conduction velocity testing across the thoracic outlet.  He also recommended a cardiologist referral based on her complaints of palpitations and family history of heart problems.  Dr. Chandran did not recommend any type of surgery but suggested she continue with physical therapy.  [Tr. at 588.]

Subsequently, she appeared at University Hospital on a number of occasions complaining of palpitations and chest pain.  [Tr. at 593-95.]

On May 4, 1998, Dr. Jill Marjama-Lyons of Neurology Consultants saw Dupree for an evaluation of questionable fibromyalgia.  [Tr. at 596]  Dupree told Dr. Marjama-Lyons that Dr. Swajian diagnosed her with TOS and that she was diagnosed at University Hospital with sinus arrhythmia and hypertension.  She also said that she was scheduled to have a cardiac catheterization on May 4 but had canceled it to keep her appointment with Dr. Marjama-Lyons.  None of the records indicate that such a procedure was scheduled or that it ever occurred.  Dr. Marjama-Lyons was unable to diagnose her with fibromyalgia.  There was no evidence of organic weakness and no obvious underlying neurological disorder.  The doctor was, however, concerned with a possible serious cardiac disease problem and recommended follow-up with cardiology.  She also suggested an evaluation by a rheumatologist, which Dupree never followed up on despite later repeated recommendations for such an evaluation.  [Tr. at 596.]

On May 22, 1998, Dr. White, a cardiologist, believed the palpitations were benign in etiology but sent her for an echocardiography to rule out any problems.  [Tr. at 605.]  It appears that the stress test on May 29 was difficult to complete because of her very low aerobic work capacity.  [Tr. at 616.]

-14-

Another orthopedic physician at University Hospital saw her in July 1998 and told her that they had nothing medically to offer her. Her tests were normal. There were not surgical treatments for TOS. She was unhappy. [Tr. at 614.]

In August 1998, Dr. Fancovic at UNM Internal Medicine, saw Dupree. She complained of a numb tongue after eating green chili. She had applied ice to her tongue, which seemed to increase numbness. [Tr. at 609.] She complained that her palpitations were worse as well, but the doctor observed negative Holter and stress test results. He offered her a new Holter test since she seemed to believe her results had been abnormal.

On September 3, 1998, Judge Vanderhoof conducted the first ALJ hearing in this matter. Dupree testified that she drove a stick-shift car and that she drove about 10 miles over a 7-day period. [Tr. at 54.] She could walk for ten to fifteen minutes and could sit "for a good amount of time" although she "paid for it" later. [Tr. at 61.] She took classes at TVI for a semester. [Tr. at 55.] She complained of wrist pain and explained that she took Tylenol, which helped some. She testified that her right wrist pain began in 1984. [Tr. at 63.] She also complained of swelling of the arms and palpitations which she believed were triggered by lifting her arms up. [Tr. at 59.] She was able to do house work, including sweeping the floor, vacuuming, and laundry. She could play solitaire. [Tr. at 68.]

On September 29, 1998, Dr. Jonathan Burg, of Physical Medicine and Rehabilitation, wrote a letter to Dr. Richard Sanders in Denver Colorado, who had referred Dupree to him (Burg). [Tr. at 623.] Dr. Sanders had apparently spoken to Dupree only on the telephone at that time and had referred her to Dr. Burg "regarding management of her TOS." In Dr. Burg's recitation of Dupree's

-15-

history, he notes that Dr. Swajian suspected she had "severe TOS,"[15] and that Dr. Chandran's laboratory results indicated a "severe reduction of inflow to both upper extremity (sic) with thoracic outlet maneuvers greater than 90 degrees."[16]  [Tr. at 623.]  Dr. Burg placed her in physical therapy. [Tr. at 625.]  His impression was "TOS severely symptomatic with TOS documented on Doppler." However, in view of the actual medical reports on which Dr. Burg appeared to rely, the diagnosis of TOS did not appear (and never appears) clear-cut, definite or documented.

**Medical Records: 1999**

In March 1999, Dr. Burg continued to see Dupree and thought the only answer for Dupree was surgery, but she did not have insurance.  [Tr. at 622.]  She completed only one session of physical therapy through Dr. Burg's office because of her lack of insurance.  [Sander's Letter, p. 2.]

In April 1999, the ALJ issued his decision noting that Dupree had been to UNM for tachycardia and palpitations but testing had been normal.  Judge Vanderhoof concluded that she could return to her past relevant work because she was able to perform light work.  [Tr. at 113.]  In late April, Dr. Burg saw Dupree again and stated in his record that he really believed she needed disability (or SSI) because she seems to have "progressive TO".  [Tr. at 621.]

On May 20, 1999, Dr. Gopal Reddy, a physician with New Mexico Vascular Diagnostics, wrote a letter to Dr. Burg concerning his visit with Dupree.  [Tr. at 626.]  Upon examination he noted "significant compression of both subclavian arteries upon 90 degree abduction and moderate extension of the shoulders on both sides."  He observed mild swelling of the right hand.  He strongly

---

[15]The actual record of Dr. Swajian's indicates that she *appeared* to have a thoracic outlet problem but that she needed more studies.  Those x-rays that Dr. Swajian recommended were normal.

[16]The letter to Swajian from Dr. Chandran indicates "some compromization" of flow beyond 90 degrees. [Tr. at 588.]  He saw no concern of any type to the arteries or veins in the upper extremities.

advised her not to do any exercises or work "keeping her hands above the level of the shoulders." He then concluded that he "definitely agrees that the patient appears to be significantly disabled with her symptoms." [Tr. at 627.] He recommended she see a thoracic surgeon with significant experience.

On June 9, 1999, Dr. Burg[17] wrote a note for Dupree stating that she was disabled for any work due to severe TOS. [Tr. at 618.] On August 26, 1999, Dr. Sanders, from Denver, wrote a report to Dr. Burg after examining Dupree. She could grip 25 pounds with the right hand and 40 with the left. She showed positive Tinel's and Phalen's in some of the right fingers. Abducting her arms to 90 degrees resulted in no pulse change in either hand with her arms in neutral, but numbness occurred after several seconds to minutes in those positions. Dr. Sanders injected a block into the pertinent area which had a good effect almost immediately. He believed her symptoms were the result of repetitive stress at work to a reasonable degree of medical certainty. But, he stated that the fact that her arterial study demonstrated compression of the subclavian artery in dynamic positions did not mean that she has arterial TOS, or that her symptoms were due to a congenital abnormality. Such a diagnosis could only be made combining these studies with other clinical findings and in Dupree's case there "are not supported clinical findings." Dr. Sanders concluded that Dupree had not had adequate conservative management at that point and he recommended that she be instructed in the "Feldenkrais method, nerve glides, posture correction and abdominal breathing." [Doc. 23, attached as exhibit.]

---

[17]Later, as noted by DVR personnel, it seems that Dr. Burg refused, at some point, to see Dupree. [Tr. at 356.]

It is noteworthy that Dupree repeatedly relies on this report from Dr. Sanders as evidence that she has severe TOS, and yet the report is not conclusive at all.

On August 31, 1999, Dr. Dale Strawn, of Lovelace Vascular Surgery, examined Dupree. She told Dr. Strawn that Dr. Sanders told her she had TOS, based on diagnostic testing, but she did not have those test results with her. [Tr. at 983.] Dr. Strawn noted that the etiology of her pain was unclear although it could be TOS. However, he was concerned with the multiplicity of her complaints and the different locations and different types of activities that triggered pain, none of which could all be ascribed to TOS. He did not believe that intervention for TOS would help and recommended physical therapy until he could see her medical records. Dr. Strawn later reviewed her x-rays which appeared normal. [Tr. at 964.]

On October 7, 1999, Dupree saw Dr. Epstein in the ER for right wrist pain. He noted "questionable TOS" and spent a lengthy time explaining to her that she was not really in need of emergency attention. She refused pain medications. [Tr. at 966, 970.]

On October 12, 1999, Dupree was referred from ER to Dr. Balcomb, a hand surgeon with Lovelace. She complained of pain in her arms, legs, feet, ankles and back, along with numbness in her fingers. She thought her arm pain was life threatening and wanted the doctor to move up her nerve study. Dr. Balcomb considered the multiplicity of her symptoms which she found confusing. She suggested fibromyalgia to Dupree but Dupree said she did not have that. Dr. Balcomb thought she might have TOS but that she did not have CTS. Dupree was upset when Dr. Balcomb told her that recurrent CTS was extremely uncommon. [Tr. at 958.]

Dr. Anne Fitzpatrick saw Dupree on October 14, 1999 for redness in her left eye, dizziness and numbness in her face. She called on October 13, complaining of chest pains and was advised to

come in immediately but could not get a ride.  A day later, she was more concerned with the eye problems and dizziness.  The physician noted that her staff had found it difficult to deal with Dupree's demands and also that Dupree used the ER inappropriately.  [Tr. at 949.]

Also on October 14, a functional capacity assessment was performed.  During the test, Dupree was noted to not put forth maximum effort and to be magnifying her symptoms.  She was not cooperative and test results were unreliable as a result.  Her pain was observed inconsistent and unpredictable.  But, the therapist noted there were objective findings related to TOS and/or CTS. [Tr. at 675.]

On November 3, 1999, Dupree saw Dr. Suter, a Neurologist.  She told Dr. Suter that Dr. Sanders and Dr. Strawn had definitely diagnosed her with TOS.  Dr. Suter, in reviewing the medical notes, stated that he did not get that impression.  He felt that Dr. Sander was hesitant in making a definitive diagnosis based on his recommendation for therapy, rather than surgery.  Dr. Suter performed an electrical study on both extremities that was negative.  There was no clinical evidence to suggest either TOS or CTS in Dr. Suter's opinion.  He told Dupree that he was concerned with the over use of a diagnosis of TOS.  [Tr. at 943, 944.]

**Medical Records:  2000**

On February 21, 2000, Dupree had a noninvasive upper extremity arterial study performed. A significant decrease in pulsation was shown above the right and left upper extremities with 90 degrees of flexion to the shoulder and upper arm.  The arterial wave form analysis was normal at rest, suggesting no underlying atherosclerotic occlusive disease.  [Tr. at 917.]  Dr. Strawn noted that the loss of signals and pulsation with certain stress maneuvers could be a normal finding in many people. "It does not necessarily indicate pathologic TOS."  [Tr. at 918.]

On March 2, Dupree insisted to Dr. Fitzpatrick that her diagnosis was "clear cut TOS".  She threatened to take Dr. Fitzpatrick to court if the doctor changed that diagnosis.  She declined the use of an anti-depressant/sleep aid.  [Tr. at 905.]  On March 17, Dr. Jerome Snyder, Internal Medicine, saw Dupree.  She told him that Dr. Fitzpatrick, her previous PCP, told her she did not need surgery and should not be referred for further evaluation.  She wanted Dr. Snyder to be her new primary care provider.  She insisted to him that she had TOS, but he was not so sure based on the records he had. She also was in pain with her left hand/wrist and believed it was CTS.  Dr. Snyder told her that TOS was difficult to diagnose and that there was not a definite way to treat it.  [Tr. at 895.]

On March 21, 2000, Dr. McGinty wrote a letter to Lovelace regarding her prior treatment of Dupree.  Dr. McGinty felt that Dupree had asked her to state Dupree was disabled and to perjure herself.  Dr. McGinty declined and Dupree became aggressive and hostile.  Dr. McGinty suggested anti-depressant medication and psychological assistance but Dupree did not comply.  Dr. McGinty wrote that she would not see Dupree again.  [Tr. at 891.]

On April 10, 2000, there is an echocardiography report.  The test results are mostly normal or average.  The test showed mild concentric left ventricular hypertrophy.  [Tr. at 653.]  On April 12, Dr. Snyder interpreted these results for her and told her that she was all right and had nothing to worry about.  She believed that she would have a heart attack and that she had hypertension, although Dr. Snyder told her she did not.  She insisted on seeing a cardiologist and he referred her.  He tried to get her to have an X-ray of her chest but she refused.  [Tr. at 872-76.]  On April 19, 2000, the stress echocardiogram was normal.  [Tr. at 854.]

On April 20, 2000, Dr. Strawn saw her again.  He reviewed many of her medical records. Dupree said her symptoms were so bad now that she felt she would die from them if something was

-20-

not done.  Dr. Strawn noted that it was unclear whether there was TO compression causing her problems.  Her symptoms seemed much broader and more diffuse than one would expect with straight TO problems.  Dr. Strawn found that TO could not be the cause of her symptoms so the etiology of her pain was still uncertain.  The only way to confirm that TO was the problem was do a first rib re-section and he was not willing to do it unless he could be fairly confident of a good result.  There were significant risks and complications from such a procedure and he would not recommend it.  He thought she should be sent to Dr. Talbot for another opinion.  [Tr. at 656.]

On April 21, 2000, Dupree was seen in cardiology.  With a lot of encouragement, she was able to complete the stress test.  She complained of pain everywhere.  Both the physician and nurse spent over four hours with her that day.  [Tr. at 847.]

On April 26, Dr. Snyder wrote to Dupree and told her that their medical relationship needed to end.  They did not see eye-to-eye on things and she was rude to the staff.  [Tr. at 843, 846.] Dupree saw Dr. Snyder again on April 28 for palpitations, TOS, CTS, a bruise on her left calf and pain in both legs.  Dupree was insisting that some of the test results from cardiology showed a very high blood pressure reading, but Dr. Snyder told her it was not high.  The stress test showed no coronary artery disease.   The electrocardiogram showed no evidence of ischemia.  He told her she had nothing to worry about which did not satisfy her.   She became very demanding and argumentative.  Dr. Snyder told her she needed to find another PCP.  [Tr. at 660, 839.]

On May 22, 2000, Dr. Ung from Cardiology told her that her blood pressure and Holter results were all right.

On June 29, 2000, Dr. Cleveland Sharp became her PCP.  He gave her a comprehensive exam that day.  She might have some TOS and CTS but he thought her problems were related to

fibromyalgia.  [Tr. at 814.]  A bone density test showed osteoporosis of the lumbar spine and osteopenia of the hip.  [Tr. at 1101.]

On July 9, 2000, she reported to a Lovelace physician that she had TOS and congestive heart failure.  [Tr. at 812.]  It was unclear to the doctor why Dupree needed to talk to a doctor in the middle of the night when there had been no significant change in Dupree's symptoms.

On July 13, 2000, Dr. Sharp discontinued Dupree's beta blockers for the palpitations since she complained of being tired on the medications.  He tried to get her to take an anti-depressant, which she refused.  [Tr. at 805.]  She rejected hormone replacement therapy because she thought it would increase her TOS pain.  On August 29, 2000, she saw Dr. Gleeson for her osteoporosis and the record notes that she quit the medications after she read the side effects from them.  [Tr. 793.]

On October 24, 2000, X-rays showed that her left wrists was normal and that her cervical spine was fairly normal, with mild narrowing.  [Tr. at 1140.]  Dr. Gleeson's staff had a difficult interaction with Dupree on October 28.  [Tr. at 776.]

On November 3, 2000, Dupree reported to Dr. Sharp how dissatisfied she was with his care of her.  He suggested that he was just the latest of many primary care physicians with whom she had had a problem and recommended she consider seriously a consult with mental health.  She was adamantly opposed to this recommendation.  [Tr. at 770.]

On November 27, 2000, Dr. Sharp recommended she try Neurontin for her pain but she did not want to take it.  She brought in her disability paperwork for him to re-do because he apparently did not fill it out correctly.  [Tr. at 768.]  He believed he filled it out to her satisfaction this time.  [Id.]

The paperwork at issue may have been the State of New Mexico's Department of Labor Certificate of Disability that is dated December 1, 2000.  That form certificate, signed by Dr. Sharp,

-22-

states that Dupree is 100% disabled due to a medical condition known as TOS, CTS, osteoporosis, back, leg and hip pain and that the disability is permanent. [Tr. at 288, 629.] Dr. Sharp apparently wrote that Dupree "cannot use either arm for more than a few minutes, e.g., cannot brush her hair, cannot stand, sit or walk for more than a few minutes without pain. Has chronic neck and arm pain such that she cannot attend to sedentary work – too distracted. . . . No accommodation will permit this woman to work in any capacity." [Id.]

**Medical Records:  2001**

On January 3, 2001, Dupree was seen by Dr. James Rice in the Spine Clinic at Lovelace, apparently referred by Dr. Sharp. [Tr. at 766.] He noted that she was in "no distress; she ambulates without pathologic features and she can toe- and heel-walk. Lumbar range of motion is effectively normal." He found the explanation for her lower extremity symptoms to be unclear. He ordered a lumbar MRI. [Tr. at 767.] On January 19, Dr. Sharp noted that she had red, hot, swollen, tender joint on the left hand. [Tr. at 756.]

On January 30 a disability report was filled out for Dupree and an interview conducted. [Tr. at 325, 336.] In the report, she states that she has osteoporosis, dyspnea, heart hypertrophy of left ventricle/heart failure/discs are bulging C5, C6." She provides an onset day of April 7, 1999. [Tr. at 325.] This form may have pertained to a subsequent application for benefits that she later did not pursue. The interviewer's notes state that Dupree was uncooperative, although appropriately dressed and groomed. She had two claims pending then before the Appeals Council. Her behavior was demanding, unreasonable and emotional. She had accused three different counselors and a supervisor of not providing proper service. [Tr. at 336.]

-23-

In February, Dupree saw Dr. Rael in the Pain Clinic. The medical record notes mostly minor problems. Her alignment was normal; there were minor facet degenerative changes. [Tr. at 1138.] Dr. Sharp wrote a letter to Dr. Sanders in February asking him for any assistance he could provide since Dupree believed only Sanders really understood her. Dr. Sharp noted that he recommended a rheumatology evaluation, but she was deeply skeptical of the diagnosis of arthritis and was convinced her problems were nerve related. He had sent her to three physiatrists[18] but those relationships all failed for a variety of reasons. [Tr. at 747.]

On February 9, Dupree told Dr. Sharp that the lumbar MRI "shook her to pieces" and she was reluctant to do the neck MRI. She had seen physiatrist Dr. Eva Pacheco earlier that week but it did not go well and Dr. Pacheco refused to see her again. [Tr. at 749.] Dupree rejected Sharp's opinion that she had arthritis. He scheduled an appointment with a rheumatologist but she apparently did not keep it. [Tr. at 749.]

On March 5, Dr. Rice told her that her MRI was normal. There was minor disc bulging. He did not feel absolute about a TOS diagnosis, even though she strongly believed in it. Her lab work suggested rheumatoid arthritis, but she refused to go and had terminated her association with Dr. Sharp as a result. [Tr. at 743.] Dr. Rice wanted her to follow up with rheumatology.

On March 6, the Appeals Council remanded this matter to the ALJ to look into possible cardiac issues and obtain testimony from a VE if necessary. [Tr. at 170.]

On March 9, Dr. Radecki of New Mexico Spine wrote to Dr. Sharp. Dupree told Dr. Radecki that she had TOS but he was very doubtful about it. He noted that TOS can be diagnosed with an

---

[18]Physiatrics deals with the diagnosis, treatment and prevention of disease with the aid of physical agents like light, heat, cold and water. Dorland's Illustrated Medical Dictionary (26th ed.), p. 1016.

EMG which was probably the best of any procedure.  Her lower back MRI was totally within normal ranges.  He scheduled her for nerve conduction velocity testing.  [Tr. at 687.]

On April 7, Dupree saw Dr. Grace Davis for an acute visit.  Dr. Davis was now her PCP.  Dr. Davis spent an hour with Dupree and 2 ½ hours going over her records.  Dr. Davis thought Dupree might have rheumatoid arthritis.  Dupree's daughter was present and she asked her mother why she did not want to pursue the rheumatoid diagnosis, and Dupree replied quickly that they would say it was arthritis and not job related.  Dr. Davis asked why it had to be job related and did not get an answer.  She followed Dupree's desires and referred her to a physiatrist.  [Tr. at 730.]

Dr. Suter's EMG/NCV April 17 report indicated no abnormalities and no evidence to substantiate CTS or TOS.  On April 26, she saw Dr. Talbot at Lovelace for a second opinion as to the TOS.  He noted that when he even touched her hands, she jumped with pain.  Yet, when she described her history and pain, she rubbed her fingers with her hands without causing any significant discomfort and used her arms for getting onto the examine table.  Dr. Talbot told her he could not explain her symptoms on the basis of TOS and would not recommend surgery.  She refused his recommendation of physical therapy.  [Tr. at 724.]

On May 3, she told Dr. Davis that she was frustrated that the TOS was not being treated.  When Dr. Davis asked who made that diagnosis, Dupree said that all doctors had except those with Lovelace.  [Tr. at 718.]  Dr. Davis again highly suspected a rheumatological disorder.  [Tr. at 710.]  Dr. Pamela Black, a physiatrist, talked about placing Dupree on BuSpar, but Dupree said she had no anxiety.  [Tr. at 1119.]

By May 31, Dr. Davis and Dupree's medical relationship had deteriorated.  Dupree complained to the health plan that Dr. Davis had not given her a cardiology referral although Dr.

Davis did not recall the request for one.  Dr. Davis had no specific cardiac concerns for Dupree, but she arranged the referral.  Dupree then requested an emergent cardiology referral which Dr. Davis refused to give because she did not see an emergency condition.

Further venous study and Doppler testing were done on Dupree in June 2001 and all showed normal results.  [Tr. at 694, 705]

On August 3, 2001, Dr. Hughes saw Dupree for the first time.  He was her new PCP.  He was concerned about possible rheumatoid arthritis.  He reviewed the normal cardiology testing that was recently performed and stated that he had no concerns about acute cardiac disease.  [Tr. at 1123.]

On September 21, 2001, Dr. Liu saw Dupree.  He submitted a letter to her as requested stating that at present, he had no diagnosis for her.  He thought an MRI of her neck should be done.  [Tr. at 684.]  On September 27, 2001, the ALJ started the re-hearing but Dupree brought so many medical records that he needed additional time to review them.  [Tr. at 77.]

On October 11, 2001, Dupree visited the New Mexico DVR.  She came to reapply for services.  DVR noted that she had at least three previous cases dating back to November 1996, all of which closed unsuccessfully either because Dupree did not feel she could work or did not keep scheduled appointments.  Dupree indicated that she wanted agency assistance to help her get social security benefits so she could eat and pay her bills.  The staff member noted that on her medical history questionnaire Dupree included problems with every condition listed except tumors, leukemia or cancer and drug/alcohol problems.  She selected every possible choice on the functional limitations checklist.  Dupree was observed to be defensive and argumentative with DVR staff on earlier occasions.  Dr. Burg's office indicated that her treatment by him was terminated.  During this DVR interview, Dupree stated that it was DVR's mission to document her inability to work so that she

-26-

could get disability.  She held DVR responsible for her financial difficulties and stated that DVR had discriminated against her.  She threatened to subpoena them all in order to get what she wanted.  [Tr. at 355-56.]

DVR agreed to write a letter for her since they believed based on some of the medical documentation that her doctors did not feel she could work.  [Tr. at 356.]  On October 11, 2001, DVR Counselor Karen Provine wrote to Judge Vanderhoof stating that Dupree's disabilities prevented her from participating in or completing the DVR training and evaluations.  Dupree had provided DVR with medical reports indicating that she was disabled from any kind of work.  Based on this information, Provine did not feel it was reasonable to expect Dupree to benefit from any further DVR services in terms of an employment outcome.  According to Provine, it appeared Dupree was totally disabled from gainful employment and would be an appropriate candidate for SSDI benefits.  [Tr. at 323.]

On October 30, Dr. Hughes saw Dupree.  He stated that he suspected for some time that she had arthritis involving her hands and possibly lower back.  Blood tests indicated some type of inflammatory joint release but there was no further work up or follow up partly because she did not want it.  She continued to resist these recommendations.  [Tr. at 1104.]

On November 2, 2001, Dupree again contacted Provine with DVR and was argumentative and demanding.  [Tr. at 359.]

After the remand, Dupree was sent for a consultative exam with Dr. G.T. Davis.  She apparently made threatening calls to Dr. Davis' office and they refused to see her.  According to one note, she told Dr. Davis' staff that "If anyone comes between me and my benefits . . . ."  [Tr. at 184.]  Dr. Davis refused to see her and informed disability services.  A number of angry exchanges occurred

-27-

over the Dr. Davis appointment, both between Dr. Davis's office and Dupree and between disability services and Dupree. [Tr. at 184, 346, 348, 351, 366-68, 1097, 1099, 1100.] Judge Vanderhoof was informed of the problem and advised the staff to send her for a consultative exam with Dr. Toner. It does not appear, based on the ALJ's later opinion, that Dr. Toner examined Dupree.

**Medical Records:  2002**

On January 6, 2002, Dr. Hughes saw Dupree who had convinced herself that her pain was secondary to CTS and TOS.  [Tr. at 1112.]  She continued to refuse to do a work up on the possible inflammatory joint disease.  Dr. Hughes diagnosed her with anxiety disorder with depression.  [Tr. at 1114.]

On February 6, 2002, the ALJ held the hearing on remand.  Dupree was represented.  [Tr. at 89.]  Dupree testified about her right hand pain, and how that pain spread to other parts of her body, along with numbness.  [Tr. at 92.]  She described her present illnesses as being TOS and compression of the arteries.  She understood that there was probably occlusion and thrombosis.  She testified that she was advised not to raise her arms up over 90 degrees.  [Tr. at 93.]  She also understood from the doctors that she had osteoporosis and carpal tunnel.  [Tr. at 93.]  She remembered reading "hypertrophy of the left ventricle."

The ALJ asked what specific parts of her body were hurting or in pain then.  Dupree responded that her hands got real cold, that she had a very dry mouth, that she burned her tongue with coffee because it was numb, that it was hard for her to take care of herself physically.  [Tr. at 94.]  The ALJ again asked where she hurt, and she said that she had numbness and pain in her arms, hands, the pelvic area,  the bottom of her feet and the knees.  Every day she felt pain somewhere. [Tr. at 95.]  She took Tylenol when the pain was really bad.  She could sit for 30 minutes before she

was uncomfortable and could stand for a good five minutes before her feet hurt.  [Tr. at 97.]  She

tried to avoid bending because she was told to be careful with bending.  She was able to lift a pint

with her hands.  On an average day, she got up, washed her face, got dressed and made breakfast.

[Tr. at 99.]

VE Pamela Bowman then gave testimony at the hearing.  She responded to hypotheticals from

the ALJ in which it was first assumed that Dupree could lift and carry a maximum of 50 pounds

occasionally and 25 pounds frequently.  She could occasionally climb, balance, stoop, kneel, crouch

and crawl but she could not lift her arms above shoulder level or perform work that was extremely

detailed.  The VE testified that Dupree could return to her past relevant work under the first

hypothetical.  The ALJ added a 20 and 10 pound limitation and the VE still concluded that Dupree

could perform the job.  [Tr. at 21.]  Next, the ALJ added the requirement for brief positional changes

at 45 minute intervals, and the VE concluded Dupree could not perform the position under the last

hypothetical.  [Tr. at 107.]  However, the VE testified that under the third hypothetical, there would

be transferability to two other job listings, those of a companion and personal attendant.  [Tr. at 107.]

Lastly, the VE was to assume that any job would not require continuous repetitive fine finger

dexterity or grasping.  The VE testified that Dupree still could work as a personal attendant or

companion with those restrictions.  [Tr. at 108-09.]  However, if the individual could lift no more

than a few ounces or only a pound, no work would be available.

On April 16, 2002, Judge Vanderhoof issued a thorough and well-reasoned decision denying

Dupree's application for benefits.  [Tr. at 24.]  The ALJ incorporated his analysis and discussion of

the evidence contained in the earlier opinion, but proceeded to provide a detailed analysis of more

recent medical records.  The ALJ documented Dupree's refusal to work with the DVR, her resistance

-29-

to follow medical providers' recommendations, her failure to undergo a consultative exam, and her persistent difficult and demanding behavior with doctors and agency personnel. [Tr. at 26.] The ALJ provided a comprehensive explanation, based on objective evidence, for why Dupree's alleged symptoms of pain and inability to work lacked credibility. [Tr. at 29-30.] Dupree's "behavior is certainly contrary to what would be expected from an individual with severe, debilitating painful symptoms." [Tr. at 30.] He carefully and thoughtfully explained how he reached his determination that Dupree retained a RFC for light work and that she was able to return to her past relevant work as a health assistant. [Tr. at 31-33.]

## Discussion

In this appeal, Dupree appears to challenge the ALJ's RFC determination and his alleged failure to consider the Certificate of Disability she received from the State of New Mexico that was signed by Dr. Sharp. She alleges that the States' determinations of disability were not considered, nor was her osteoporosis of the spine and hip. [Doc. No. 1.] In her reply, Dupree argues that she can no longer lift 50 pounds, that she has lost an inch in height, that she cannot lift her hands above the level of her shoulder, that she cannot handle the stress of her prior job and that she cannot drive. [Tr. at 22.] The Commissioner claims that the ALJ's decision was supported by substantial evidence and represented a correct application of the regulations. [Tr. at 16.]

## I.    RFC DETERMINATION

Dupree's *pro se* pleading does not provide any specific basis for why the ALJ's determination of her residual functional capacity might have been in error. Thus, the Court presumes a general challenge to the RFC determination and concludes that there was substantial evidence to support Judge Vanderhoof's finding that Dupree retained the RFC to engage in light work.

-30-

The ALJ is entrusted with the determination of a claimant's RFC and such determination must be based on all of the evidence in the record.  20 C.F.R. § 404.1546; Corber v. Massanari, 2001 WL 1203004 at *5 (10th Cir. 2001).  The ALJ must evaluate a claimant's physical and mental RFC, must determine the physical and mental demands of the claimant's past relevant work and finally determine if the claimant has the ability to meet the job demands despite any physical or mental limitations. Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003).

Social Security Ruling ("SSR") 96-8p defines "RFC" as "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  SSR 96-8p requires that the ALJ's RFC assessment be based on all of the relevant evidence in the case, including medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, medical source statements, and the effects of symptoms, including pain, that are reasonably attributed to the claimant's medically determinable impairments.

Further, the RFC assessment must consider and address medical opinions from treating sources.  "Controlling weight" must be given to a treating physician's opinion about the nature and severity of a claimant's impairments if "it is well supported by clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence in the record."  20 C.F.R. § 404.1527(d)(2); Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001).

Here, Judge Vanderhoof determined that Dupree retained a RFC that supported exertionally light work activities provided no detailed instructions and repeated use of the hands above the shoulders were required.  [Tr. at 30.]  He further concluded that nonexertional factors did not

-31-

significantly erode this work capacity.  The ALJ's opinion was consistent with the evidence and not inconsistent with the opinion of any treating physician's opinion  Finally, his credibility findings cannot be questioned in light of the extensive record demonstrating that Dupree's symptoms were unsupported by objective medical evidence.

Although this Court is not to re-weigh the evidence or substitute its opinion for that of the ALJ, the Court merely states here that the evidence overwhelmingly supports the ALJ's conclusion. Indeed, it appears that Dupree was searching for a diagnosis that might entitle her to benefits rather than pursuing medical care and treatment for possibly legitimate medical conditions from which she might actually have suffered, like rheumatoid arthritis, anxiety, or depression.  While the Court makes no determination here that Dupree actually did suffer from arthritis or depression, it simply notes that these are the problems a number of treating physicians documented as possibilities and for which Dupree refused to seek testing or treatment.[19]

Of the dozens of physicians and specialists seen by Dupree, few, if any, confirmed a diagnosis of CTS.  Dr. Monheim performed a carpal tunnel release procedure but then later refused to see Dupree because she continued to complain of wrist pain in the face of consistently negative nerve conduction studies.  Ultimately, he gave her 1% rating of permanent disability.  With the exception of treating physician Dr. Cleveland Sharp, who is discussed later, none of the many doctors indicated that Dupree was unable to work due to her wrist pain.  Dr. McGinty restricted Dupree from using her right hand repetitively at work, but still returned her to work.  Dr. Jones believed a diagnosis of CTS was questionable.  Dr. Vichick noted that she had convinced herself that she had CTS, but that

---

[19]An inference could be drawn from a few records that Dupree was confused as to what might support a workers' compensation award in contrast to what might support a social security benefit award.

he found "very mild" CTS.  First Choice physicians noted that the etiology of Dupree's complains were unknown.  Dr. Balcomb later found no CTS, and Dr. Suter concluded there was no clinical evidence of CTS.

With respect to TOS, Dr. Bicknell concluded early on that there was no sign of TOS.  Dr. Swajian concluded that Dupree definitely appeared to have a TO problem but that more testing was needed.  That testing, however, was entirely normal.  Dr. Swajian found that Dupree was unable to work only for temporary periods of time.  Dr. Chandran noted that there was some compromization of blood flow but only when the arms were extended beyond 90 degrees, a position that is not required repeatedly in Dupree's past relevant work or in most work.  Dr. Strawn did not think Dupree had TOS.  Dr. Epstein thought a diagnosis of TOS was questionable.  Dr. Balcomb later concluded that there was no evidence of TOS.  Dr. Suter found no clinical evidence of TOS.  Dr. Snyder noted that she insisted she had TOS, but that he did not believe this was the correct diagnosis.  Neither Dr. Rice nor Dr. Radecki was confident of a diagnosis of TOS.  Dr. Davis could not confirm TOS, and Dr. Talbot could not explain Dupree's symptoms on the basis of TOS.  Finally, Dr. Hughes found that a diagnosis of TOS was unconfirmed even though Dupree was convinced of that diagnosis.

Dr. Marjama-Lyons found no underlying neurological disease to explain Dupree's symptoms.  A number of physicians simply had nothing to offer Dupree in terms of medical explanations, including Dr. Brown, Dr. Fancovic, and Dr. Liu.

Out of the overwhelming number of physicians who saw Dupree, virtually all of them refused to confirm CTS or TOS.  Only a few doctors' reports might be read to support Dupree's claim of TOS.  Dr. Sanders in Denver apparently spoke to Dupree over the telephone and saw her for one examination.  Although Dupree believed that Dr. Sanders supported her claim, he did not conclude

that she had arterial TOS.  Indeed, after he examined her, he found there were no clinical findings to support such a diagnosis and that the mere fact that there was compression of the subclavian artery in dynamic positions (with 90 degree extension, for example), did not indicate arterial TOS.  [Aug. 26, 1999 letter from Dr. Sanders to Dr. Burg, attachments to Plaintiff's reply.]

Dr. Burg, of Physical Medicine and Rehabilitation, first saw Dupree in September 1998, after Dupree had had a telephone conversation with Dr. Sanders.  It seems the Dr. Burg was acting under the assumption then that Dupree had a thoracic outlet problem or that he believed statements that Dupree attributed to other physicians but that were not made.  After a single examination, Dr. Burg concluded she had TOS and proceeded with a plan for physical therapy.  After a few visits, he believed that surgery was the only answer for her and that she had progressive TO.  Dr. Burg wrote a note for Dupree stating that she was disabled for any work due to severe TOS.  Dr. Reddy saw Dupree upon Dr. Burg's suggestion and based on that one examination, concluded that she was significantly disabled with her symptoms.  Findings of a nontreating physician based on limited contact and examination are of suspect reliability.  Frey v. Bowen, 816 F.2d 508, 515 (10th Cir. 1987).

Although Dr. Sharp, a treating physician, believed that she might have some TOS and some CTS, he initially thought Dupree might have fibromyalgia.  Dr. Sharp never conclusively stated in his medical reports from examinations of Dupree that she had TOS.  However, on a state form – Certificate of Disability," it appears that Dr. Sharp wrote Dupree was 100% disabled due to TOS, CTS, osteoporosis and other pain.  On the form, Dr. Sharp  found that Dupree could not use either arm for more than a few minutes and could not sit, stand or walk for more than few minutes without pain.

-34-

The Court is not any more convinced by this form than was the ALJ.  Dr. Sharp had seen Dupree a few days before he signed the form in question.  He noted in those records that Dupree had presented him with the disability forms again and he surmised that there must have been "deficiencies" in the way he filled them out before.  This time he filled them out in a way that satisfied her.  Based on Dupree's consistent bullying and threatening tactics, the Court is not convinced that the state disability form represents Dr. Sharp's true medical opinion.  This is particularly true in light of the dozen or so doctors and specialists who found, over and over, no clinical support of a diagnosis of TOS.  Moreover, the conclusions or statements by Dr. Sharp, Dr. Burg and Dr. Reddy are not "well supported by clinical and laboratory diagnostic techniques."  Drapeau, 225 F.3d at 1213.

Dupree was diagnosed with osteoporosis, but no doctor concluded that it precluded her from being able to work.  Indeed, Dupree refused all treatment for the osteoporosis based on potential problems with the medications.  Failure to follow prescribed medications and treatment is a legitimate consideration in evaluating the validity of an alleged impairment.  Decker v. Chater, 86 F.3d 953, 955 (10th Cir. 1966).

Dupree's alleged heart problems were also checked out thoroughly through testing and doctor's examinations.  Again, the doctors concluded that her palpitations and/or heart problems were nothing to be concerned about, even though Dupree was convinced that she did have a heart condition.

In addition, the only functional capacities evaluation that was performed did not conclusively establish what restrictions Dupree might have since she was uncooperative throughout the exam.  A refusal to cooperate with medical testing procedures undermines credibility.  See Nguyen v. Shalala, 43 F.3d 1400, 1404 (10th Cir. 1994). While the physical therapist restricted Dupree's

-35-

activities somewhat, the ALJ properly concluded that not all of the therapist's restrictions were warranted, particularly in view of the treating physicians' repeated conclusions that the primary appropriate restriction was no lifting above the shoulder level.

The ALJ gave Dupree the benefit of the doubt in determining that she was restricted to lifting 20 pounds occasionally and 10 pounds frequently, that she should not be required to engage in repetitive use of her hands above her shoulders, and that her work could not entail detailed instructions.  The fact that Dupree now states that she cannot lift 50 pounds and cannot drive does not change the result here.  In addition, the fact that she may have lost one inch of height does not indicate that her osteoporosis prevents her from working.

Finally, Dupree's symptoms of pain all over are belied by the objective diagnostic testing, lack of pain medications, her own activities and unconvincing testimony at the hearing as to what actually was causing her pain at that moment (as opposed to how she was able to interpret certain medical records that she read), and her obvious desire to portray herself as someone with a disability or systemic disease that no medical care provider could ever confirm.  Subjective complaints of pain may be disregarded if unsupported by objective medical testing.  *See* <u>Frey</u>, 816 F.2d at 515.  The Court concludes that substantial evidence supports the ALJ's RFC finding and his finding that Dupree's description of pain and impairment lacked credibility.

## II.   <u>STATE DISABILITY DETERMINATION</u>

Dupree claims that the ALJ did not consider or give proper weight to the State's determination that Dupree is unable to work and that she has been awarded general assistance.  It is true that Dupree received a Certificate of Disability from the State of New Mexico and that she has been awarded assistance by the State.  However, disability determinations by other agencies are not

binding on the Secretary.  Musgrave v. Sullivan, 966 F.2d 1371, 1375  (10th Cir. 1992).  The Secretary must consider state findings of disability, but it is not clear how much weight they must be accorded in the Tenth Circuit.  Richter v. Chater, 900 F. Supp. 1531, 1538 (D. Kan. 1995).

Here, the ALJ very clearly stated that he considered the State's Certificate of Disability but accorded it little weight under the circumstances of this case.  [Tr. at 30.]  Some of the many circumstances considered by Judge Vanderhoof are that Dupree indicated to DVR that she had no intention to return to work.  This certainly seems to be true since there is nothing in the record demonstrating that APS actually terminated Dupree.  Instead, it appears that Dupree stopped going to work.  The ALJ also considered Dupree's communications to the DVR that she believed the agency's purpose was to get her social security benefits (rather than return her to work).  [Tr. at 355.]

In addition, the ALJ recognized that the DVR's Certificate of Disability and the State's award of assistance were supported by a very few doctor's reports, rather than Dupree's extensive medical history that the ALJ reviewed in denying benefits to Dupree.  While other state agencies may have awarded Dupree forms of assistance, it seems that they relied on the DVR reports rather than Dupree's long documented medical history that was scrupulously examined here by the ALJ and the Court.

Unfortunately, it may have been Dupree's lack of cooperation, her threats, and her bullying tactics that finally convinced the DVR to "throw in the towel" to some extent.  While Dupree's unreasonable behavior may have worn down some medical providers and state agency personnel, the Court concludes that, among other things, her well-documented medical history and objective

diagnostic testing demonstrate that substantial evidence supports the ALJ's denial of benefits, notwithstanding decisions by the State to award her assistance.

### **Recommended Disposition**

That Dupree's request to reverse and remand [doc. 1] be DENIED and that this matter be dismissed, with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge